CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

OCT 1 0 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERESA A. UNDERWOOD,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00062 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Teresa A. Underwood, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Underwood's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:07-cv-00062-GMW-PMS   Document 25   Filed 10/10/08   Page 1 of 56   Pageid#: 72

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Underwood filed her applications for DIB and SSI on April 18, 2005. (Record, ("R."), at 15, 28), alleging disability as of February 14, 2005, due to back and neck problems, depression, diabetes and breathing problems. (R. at 15, 103.) The claims were denied initially and upon reconsideration. (R. at 27, 29-35, 397-404.) Underwood then requested a hearing before an administrative law judge, ("ALJ"). (R. at 41.) The ALJ held a hearing on August 1, 2006, at which Underwood testified and was represented by counsel. (R. at 412-44.)

By decision dated November 20, 2006, the ALJ denied Underwood's claims. (R. at 12-26.) The ALJ found that Underwood met the insured status requirements of the Act for DIB purposes through June 30, 2010. (R. at 17.) The ALJ also found that Underwood had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 17.) The ALJ determined that the medical evidence established that Underwood suffered from severe impairments, namely left lateral epicondylitis, complex regional pain syndrome, bulging discs in the lumbar spine, small disc protrusion at C6-7 and C7-T1, sacroiliitis and a depressive disorder. (R. at 17-19.)

Case 2:07-cv-00062-GMW-PMS   Document 25   Filed 10/10/08   Page 2 of 56   Pageid#: 73

However, the ALJ found that Underwood did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ further found that Underwood retained the residual functional capacity to perform simple, non-stressful work that did not require lifting and carrying of items weighing more than seven pounds occasionally or three pounds frequently. (R. at 20.) Furthermore, the ALJ determined that Underwood was limited to standing and walking for one hour at a time, sitting for more than one-half hour at a time, for a total of six hours and two hours, respectively, during a typical eight-hour workday. (R. at 20.) The ALJ also determined that Underwood was unable to perform any stooping, kneeling, crouching, crawling, pushing and pulling, and that she should avoid work around humidity and vibrations. (R. at 20.) The ALJ found that Underwood was unable to perform any of her past relevant work and that transferability of job skills was not material to this determination of disability because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Underwood possessed transferable job skills. (R. at 24.) Based upon Underwood's age, education, work experience and residual functional capacity, the ALJ determined that there were other jobs existing in significant numbers within the national economy that she could perform, including jobs as a production inspector, an amusement attendant, a mechanical assembler and a file clerk. (R. at 24-25.) Thus, the ALJ concluded that Underwood was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Underwood pursued her administrative appeals, (R. at 11A), and sought review of the ALJ's decision, but the Appeals

-3-

Council denied her request for review. (R. at 6-8.) Underwood then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). This case is now before the court on Underwood's motion for summary judgment, which was filed on April 8, 2008, and on the Commissioner's motion for summary judgment, which was filed on June 19, 2008.

## *II. Facts[1]*

Underwood was born in 1967, (R. at 100), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Underwood earned a general equivalency development diploma, ("GED"), (R. at 110), which classifies her a having a "high school education and above" under 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). Underwood has past relevant work experience as a bus driver, a laborer in a furniture factory and as a certified nurse's assistant, ("CNA"). (R. at 104.)

At the hearing before the ALJ on August 1, 2006, Underwood testified that her most recent employment was as a bus driver for the public school system in Henry County, Virginia, where she worked for approximately four years. (R. at 415.) Underwood also testified that she worked as a CNA periodically for approximately 20 years. (R. at 416.) She stated that, as a CNA, she performed tasks such as in-

---

[1]The relevant time period to this court's decision regarding Underwood's claims is February 14, 2005, her alleged onset date, through the date of the ALJ's decision. Any medical records summarized within this opinion not relevant to that time period are included only for clarity of the record and to fully represent the extent of Underwood's impairments and treatment.

-4-

home health care which required her to prepare meals, as well as bathe and dress patients. (R. at 416.) Underwood testified that the job required frequent lifting. (R. at 416.) According to Underwood, she realized she could no longer perform her duties as a CNA following an accident on December 14, 2001, where she fell down some stairs. (R. at 416-17.) Underwood testified that, since the injury, her condition had continuously digressed. (R. at 417.) Underwood explained that she was forced to stop work in February 2005, due to diabetes, fibromyalgia, asthma and pinched nerves. (R. at 417.) She testified that she was supposed to have surgery to address a pinched nerve in her left arm in February 2006; however, she had a total hysterectomy in May 2006, thereby preventing her from being able to have surgery on her arm. (R. at 417.) She noted that her doctor had advised her that the surgery would allow her to regain full use of her left arm. (R. at 418.) Underwood also testified that she had several bulging discs in her lower back, two deteriorating discs in the center of her back and three protruding discs in her neck. (R. at 418.) Underwood further testified that she suffered from depression and anxiety. (R. at 418.)

Underwood described her lower back pain as "a constant throbbing, aching, stinging, burning, stabbing [and] shooting pain" that radiated down into her leg. (R. at 418.) She indicated that she frequently experienced numbness in her left leg, which impacted her ability to bend over. (R. at 418.) She explained that her pain prevented her from fully bending over, noting that she was unable to bend to pick up items. (R. at 419.) In addition, Underwood explained that she could not squat to the ground, commenting that if she attempted to do so, she would be unable to get back up off the ground. (R. at 419.) Underwood testified that her condition limited her

-5-

ability to walk up and down stairs and hills due to her instability. (R. at 419.) At the hearing, Underwood used a cane for ambulation, and she indicated that Dr. Larry J. Winikur, M.D., advised her to use a cane if she was comfortable with it, noting that it would help ease her pain and prevent her from putting too much pressure on her left leg. (R. at 419.)

Furthermore, Underwood testified that she suffered from joint pain, which she attributed to fibromyalgia. (R. at 420.) She indicated that her joint pain was present in her knees, hips, elbows and fingers. (R. at 420.) She described her knee pain as "a constant aching, throbbing, burning type sensation." (R. at 420.) Underwood commented that the pain affected her ability to walk and stand. (R. at 420.) She noted that she experienced similar pain in her hip and elbows. (R. at 420.) Also, Underwood testified that pain in her left shoulder limited her ability to reach overhead, explaining that she could not "get [her] arm up to [her] head." (R. at 420.) Underwood stated that these problems also caused her to experience difficulty dressing herself. (R. at 421.) She said that she had to wear things that were easy to put on, indicating that she seldom wore anything that had to be buttoned. (R. at 421.) Underwood testified that she had frequent swelling in her fingers and that her left hand had been affected more than the right, causing loss of feeling and inability to grip. (R. at 421.) She further testified that she could not hold anything of much weight in her left hand because she would "lose control of it, and . . . drop it." (R. at 421.) Underwood explained that she could only hold light things that were big, noting that she could not hold small items because she could not close her hand completely. (R. at 421-22.) Underwood also commented that her hand had worsened since her last evaluation due to a diminished grip and constant numbness. (R. at 422.)

-6-

Underwood testified that she had also developed swelling between her collarbone and her neck. (R. at 424.) She stated that her doctors had informed her that the swelling was related to the nerve problem in her left arm. (R. at 425.) She also stated that the pain in her neck area was due to her protruded discs. (R. at 425.) Underwood described the pain as a constant "throbbing, aching, stinging, burning, stabbing [and] shooting pain" that radiated down into her back. (R. at 425.) She testified that the pain occasionally affected her ability to move her head. (R. at 425.) Underwood also testified that she suffered from asthma, noting that she was hospitalized due to the condition in February 2006. (R. at 425.) She stated that she was required to take breathing treatments every six hours and that she also used an inhaler that she always carries with her. (R. at 425-26.) Underwood testified that fumes, heat, dust, perfume, hairspray and freshly cut grass all have a negative impact upon her asthma and allergies. (R. at 426.)

Additionally, Underwood explained that she suffered from depression and anxiety, which she attributed to her inability to move around and be active like she was in the past. (R. at 426.) She testified that she used to coach sports, drive a bus and stay active, but, due to her condition, she said she was now unable to do those things. (R. at 426.) She also indicated that she did not like being around strangers because it made her "real nervous[,]" causing anxiety. (R. at 426.) Underwood testified that she had presented to the hospital several times due to anxiety. (R. at 426.) She noted that she had been prescribed two types of medication to treat her depression and anxiety, but stated that "nothing help[ed]." (R. at 427.) She

-7-

acknowledged that, just like the medication for pain, the medication for depression and anxiety took "the edge off, but nothing stop[ped] it." (R. at 427.)

When asked about her activities of daily living, Underwood stated that she did not "do a whole lot." (R. at 427.) She testified that "it's a day's chore just to try to keep [her] house maintained." (R. at 427.) She explained that she had difficulty sleeping, noting that she was constantly up and down throughout the night. (R. at 427.) Underwood testified that she normally fixed herself breakfast each morning. (R. at 428.) She also testified that she then usually tried to take a shower and noted that she could no longer take a bath because of her inability to get in and out of the tub. (R. at 428.) Underwood further explained that she used to be able to clean her house in one hour; however, due to her condition, she claimed it now takes her all day just to vacuum because she is unable to stand for extended periods. (R. at 428.) She explained that she had to sit on the couch in order to dust her coffee table, noting that she had to take breaks to alleviate the pain associated with constant standing. (R. at 428.)

Underwood testified that her son helped her a lot with household chores. (R. at 428.) She stated that he usually vacuumed and assisted with the chores that were the hardest for her to perform. (R. at 428.) Underwood acknowledged that she occasionally drives to doctor's appointments or the grocery store. (R. at 429.) She stated that she does not visit friends nor does she attend church because she is unable to sit through an hour church service as she was able to do in the past. (R. at 429.) Underwood testified that she was advised not to lift more than a bag of sugar. (R. at 429.) She further testified that she could lift a gallon of milk with her right hand, but

not her left, explaining that she has to use her right hand for everything. (R. at 429.) She indicated that she could only stand for approximately 10 to 15 minutes in one position before she would have to sit down due to pain. (R. at 429.)

Barry Hensley, a vocational expert, also was present and testified at Underwood's hearing. (R. at 431-443.) Hensley identified Underwood's past work as a CNA as heavy,[2] semiskilled work. (R. at 432.) Furthermore, Hensley noted that Underwood's work in furniture manufacturing was medium,[3] unskilled work and her work as a bus driver was light,[4] semiskilled work. (R. at 432.) The ALJ then asked Hensley to consider a hypothetical individual of Underwood's age, education and work experience, who could occasionally lift items weighing up to 20 pounds, frequently lift items weighing up to 10 pounds and who could stand or walk for approximately six hours in a typical eight-hour workday. (R. at 433.) In addition to those limitations, the ALJ asked Hensley to consider Underwood's mental impairments and other moderate limitations that restricted her to simple, non-stressful work. (R. at 433.) Hensley testified that such limitations would place Underwood in the light range of work, but noted that because bus driving qualifies as a

---

[2]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008). If an individual can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

-9-

semiskilled activity, the mental restriction of simple, non-stressful would not apply. (R. at 433.) He also noted that Underwood's other past relevant work fell into the medium level of work or higher; thus, based upon the hypothetical presented, Hensley opined that Underwood was not capable of performing her past relevant work. (R. at 433.) However, he pointed out that there were other types of alternative work that such an individual could perform, including simple, unskilled, entry level work as a production inspector, a vehicle operator and a mechanical assembler. (R. at 434.)

The ALJ then asked Hensley to consider the limitations as noted in Exhibit 15F,[5] and, based upon those limitations, if any jobs existed that such an individual could perform. (R. at 434-35.) Hensley opined that such an individual would be limited to sedentary work, considering the lifting restrictions. (R. at 435.) Thus, in order to accommodate for such limitations, the individual would need jobs that allowed intermittent sit/stand options. (R. at 435.) Hensley stated that an individual with such limitations could perform work as a production inspector, an amusement attendant, a file clerk and a mechanical assembler at the sedentary level. (R. at 436.) Hensley noted that each of these jobs were sedentary, unskilled, entry level positions that allowed for a person to stand occasionally. (R. at 436.)

Next, the ALJ asked Hensley to consider the limitations set forth in Exhibit 24F,[6] and to identify any jobs that would be available to an individual with such

---

[5] Exhibit 15F is a Medical Assessment Of Ability To Do Work-Related Activities (Physical) form, which was completed by Dr. Larry J. Winikur, M.D., on December 5, 2005. (R. at 343-44.)

[6] Exhibit 24F contains a functional capacity evaluation December 9, 2003, performed at Therapy Associates. (R. at 391-96.)

limitations. (R. at 436-37.) Hensley testified that, based upon the limitations in Exhibit 24F, Underwood would be limited to sedentary work. (R. at 439.) However, due to the restrictions noted, the number of jobs available within the sedentary category would be reduced. (R. at 439.) Hensley opined that Underwood could work competitively with job concessions, but stressed that it would have to be an occupation that allowed for concessions, such as what a Workers' Compensation case or sheltered employment might provide. (R. at 439.) Hensley stated that his testimony was consistent with the Dictionary of Occupational Titles, ("DOT"), but noted that the DOT does not discuss alternative positions. (R. at 441.) Hensley explained that his testimony did not include a full sit/stand option, just simple jobs that allow the opportunity to stand periodically. (R. at 441.)

Upon questioning by the claimant's counsel, Hensley acknowledged that being limited to occasional lifting of items weighing up to seven pounds and frequently lifting items weighing up to three pounds would be less than the full range of sedentary work. (R. at 441.) Underwood's counsel then asked Hensley to consider the physical limitations noted in Exhibit 15F and the psychological limitations noted in Exhibit 23F.[7] (R. at 442.) Based upon those limitations, Hensley opined that Underwood could perform no work. (R. at 442.) Lastly, Hensley was asked, if he were to assume that Underwood's testimony was credible, would there be any jobs that she could perform. (R. at 442.) He noted that Underwood's perception of her situation was that her condition prohibited her from work. (R. at 443.)

---

[7]Exhibit 23F is a Medical Assessment Of Ability To Do Work-Related Activities (Mental), which was completed by Dr. Keshavpal Reddy on July 17, 2006. (R. at 389-90.)

In rendering his decision, the ALJ reviewed medical records from Northern Hospital of Surry County; Dr. Larry J. Winikur, M.D.; Morehead Memorial Hospital; E. Hugh Tenison, Ph.D., a state agency psychologist; Louis A. Perrott, Ph.D., a state agency psychologist; Dr. Robert O. McGuffin, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; R.J. Reynolds-Patrick County Memorial Hospital; Bone & Joint Center, Inc.; Therapy Associates; Primary Associates of Martinsville; Memorial Hospital; Dr. Keshavpal Reddy, M.D.; Dr. John Selman, M.D.; Dr. Andrew G. Gehrken Jr., M.D.; Dr. Holyfield, M.D.; Dr. Samuel Hurt, M.D.; and Dr. James M. Isernia, M.D. Counsel for the claimant submitted a medical assessment completed by Dr. Winikur dated July 7, 2007, to the Appeals Council.[8]

Underwood was treated at R.J. Reynolds-Patrick County Memorial Hospital, ("Patrick County Hospital"), on March 27, 2002, and June 14, 2003. (R. at 199-206.) On March 27, 2002, Underwood underwent an upper gastrointestinal, ("GI"), x-ray and an abdominal ultrasound. (R. at 199-200.) The upper GI revealed possible constipation and a small sliding type hiatal hernia with reflux esophagitis. (R. at 199.) The abdominal ultrasound showed evidence of a previous cholecystectomy with no abnormalities observed. (R. at 200.) Underwood presented to Patrick County Hosptial emergency room on June 14, 2003, complaining of right hand pain. (R. at 206.) She was diagnosed with tendinitis and inflammation in the right hand. (R. at 206.)

---

[8]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 2:07-cv-00062-GMW-PMS   Document 25   Filed 10/10/08   Page 12 of 56   Pageid#: 83

On December 9, 2003, a functional capacity evaluation, ("FCE"), was performed on Underwood at Therapy Associates.[9] (R. at 391-96.) The findings showed that Underwood gave maximal, consistent effort throughout the evaluation and that the results were indicative of her performing to her true capabilities. (R. at 391.) Underwood was found to have an excellent ability in the following areas: active trunk hyperextension, right shoulder hyperextension, right shoulder internal rotation, bilateral active range of motion in the elbows, wrists, ankles and knees and right handgrip strength. (R. at 391.) Underwood's ability was assessed as good in the following areas: active range of motion as to bilateral, lateral neck flexion, cervical hyperextension and forward cervical flexion, lateral trunk flexion to the right, right shoulder abduction, static push force, static pull force and right handed carry. (R. at 391.) Underwood's ability was found to be fair in bilateral hip abduction, bilateral hip and internal and external rotation, horizontal light and front carry, left handed carry, sitting and standing tolerance, walking ability, dynamic balance and right handed coordination. (R. at 392.)

The FCE also identified several significant deficits in Underwood's abilities. (R. at 392.) Underwood's ability was decreased as to active range of motion for bilateral cervical rotation, bilateral shoulder external rotation, bilateral hip abduction and hyperextension, floor to waist lift, dynamic pushing/pulling, left handgrip strength, stair negotiation and left hand coordination. (R. at 392.) It was determined that Underwood had a poor ability as to active trunk flexion, lateral trunk flexion to the left, bilateral shoulder flexion, left shoulder hyperextension, abduction and

---

[9]This particular medical report was presented to the ALJ by Underwood's counsel during the August 1, 2006, hearing before the ALJ.

-13-

internal rotation, bilateral hip flexion with knees extended, waist to overhead lift, trunk flexion in sitting and standing, trunk rotation, kneeling, repetitive shallow squats and step ladder negotiation. (R. at 392.) Furthermore, the FCE concluded that Underwood was unable to perform elevated overhead work. (R. at 392.)

Shortly after the completion of the FCE, on December 22, 2003, Underwood was treated at Memorial Hospital. (R. at 338.) A medical assessment indicated menorrhagia secondary to chronic anovulation, fatigue and allergic rhinosinusitis. (R. at 338.) Underwood was advised to continue taking Provera and Hemocyte, was prescribed amitriptyline and was given samples of Rhinocort. (R. at 338.)

Underwood received treatment from Dr. Larry J. Winikur from March 1, 2004, to September 12, 2005. (R. at 131-45.) On March 1, 2004, Underwood presented for pain management and complained of complex regional pain syndrome of the left upper extremity and left sacroiliitis. (R. at 145.) Underwood reported a pain score of nine out of 10 and the treatment notes show that her pain was "definitely radiating more proximally." (R. at 145.) Dr. Winikur noted swelling, pain, hyperpathia and allodynia of the left upper extremity. (R. at 145.) Underwood also reported pain in the left sacroiliac joint. (R. at 145.) At the time of this visit, Underwood was taking Lortab and Darvocet to treat her pain; however, she explained that the Darvocet was not strong enough and requested a stronger medication. (R. at 145.) Nonetheless, Dr. Winikur opted to continue treatment with Darvocet. (R. at 145.) Dr. Winikur performed a left stellate ganglion block under conscious sedation and fluoroscopic guidance. (R. at 145.) In addition, Underwood received a left sacroiliac joint injection, which she tolerated well. (R. at 145.) Underwood was discharged in good

-14-

condition. (R. at 145.)

Underwood again saw Dr. Winikur on April 5, 2004, and reported a chief complaint of complex regional pain syndrome type I of the left upper extremity. (R. at 144.) Underwood further reported that the stellate ganglion block performed during her March 2004 visit did not provide much relief, which Dr. Winikur noted could have been due to misplacement of the needle. (R. at 144.) Underwood explained that she was having "somewhat better control" of her sacroiliac joint pain, thus, according to Dr. Winikur, there was no need for an injection. (R. at 144.) Underwood's pain score was reported as eight out of 10. (R. at 144.) Dr. Winikur noted that, at the time of this visit, Underwood was quite active, was using her left arm and was able to perform all of her activities of daily living. (R. at 144.) Underwood described her pain as sharp, aching, burning, throbbing, cramping, shooting and stabbing. (R. at 144.) Dr. Winikur performed a stellate ganglion block and prescribed Lortab. (R. at 144.)

On April 19, 2004, Underwood presented to Patrick County Hospital for a right arm doppler ultrasonographic examination, which showed the venous drainage of the right arm to have normal augmentation and compressibility with spontaneous and phasic flow at all levels. (R. at 189.) There was a slight decrease in flow around the antecubital fossa to the radial and ulnar veins, possibly representing insufficiency. (R. at 189.) No abnormal masses were seen and there was no evidence of deep venous thrombosis. (R. at 189.)

On May 5, 2004, Underwood saw Dr. Winikur and reported chief complaints

-15-

of complex regional pain syndrome of the left upper extremity and left sacrioliitis, which was said to be work related. (R. at 143.) Underwood reported that the last stellate ganglion block provided nearly one month of relief, which pleased Dr. Winikur. (R. at 143.) Dr. Winikur reported that Underwood's sacroiliitis had completely resurfaced. (R. at 143.) Underwood complained of pain in her buttock, down her posterior leg and into the groin and upper arm. (R. at 143.) Underwood rated her pain as eight or nine out of 10. (R. at 143.) As such, Dr. Winikur proceeded with sacroiliac joint injections and a stellate ganglion block. (R. at 143.) Underwood tolerated the treatment well and was discharged in good condition. (R. at 143.) Underwood returned on June 21, 2004, with complaints of increasing left arm pain. (R. at 142.) Underwood sought to have injections to treat her complex regional pain syndrome and chronic sacroiliitis. (R. at 142.) She indicated that the weather impacted her condition and had increased her pain. (R. at 142.) Dr. Winikur noted concern about the possibility of Underwood's reflex sympathetic dystrophy, ("RSD"), spreading to the contralateral limb. (R. at 142.) He noted that she was beginning to have some extension to the right shoulder area and noted a pain score of 10 out of 10. (R. at 142.) Underwood described her pain as sharp, aching, burning and throbbing, and she described leg cramping, with tingling, numbness and weakness. (R. at 142.) Dr. Winikur opined that her lower extremity pain was related to her sacroiliitis. (R. at 142.) Dr. Winikur performed a stellate ganglion block under conscious sedation, which Underwood tolerated well. (R. at 142.)

On July 19, 2004, Underwood presented with a chief complaint of chronic sacroiliitis. (R. at 140.) Underwood complained of chronic pain in her left sacroiliac joint, which she said radiated into the groin area. (R. at 140.) She indicated that the

-16-

injections gave her short term relief, but Dr. Winikur noted that she needed a longer lasting procedure such as radiofrequency neurolysis. (R. at 140.) Dr. Winikur explained that this procedure had a 50 percent failure rate, but stated that his office would do its best to give her long term relief. (R. at 140.) Underwood agreed to undergo radiofrequency neurolysis of the left sacroiliac joint. (R. at 140.) Underwood returned on August 18, 2004, and reported that she received some relief from the radiofrequency neurolysis, but noted that she had more progressive symptoms down her leg. (R. at 139.) Dr. Winikur noted that there was a suggestion of radiculopathy and recommended a magnetic resonance imaging, ("MRI"), of the lumbar spine to rule out any possible disc injury. (R. at 139.) He further noted that he was not able to decrease her opioids during this visit due to her intense pain. (R. at 139.) Underwood rated her pain as a 10 out of 10 and complained of pain in the left upper arm. (R. at 139.) Dr. Winikur elected to cease performance of further left stellate ganglion blocks. (R. at 139.) He observed Underwood to be very uncomfortable and quite frustrated. (R. at 139.) Dr. Winikur filled out paperwork so that Underwood could be approved for handicapped parking. (R. at 139.)

On September 15, 2004, Underwood presented to Laura Young-Ligon, FNP, with chief complaints of lumbar pain, left leg pain and left upper extremity pain. (R. at 137.) She described her left arm and shoulder pain as a "constant throbbing" pain and explained that she experienced redness along her elbow with edema and burning. (R. at 137.) Underwood also reported weakness in the left hand and left leg. (R. at 137.) Underwood stated that she normally took Lortab 7.5/500 milligrams, ("mg"), up to three times per day and Lortab 5/500 mg up to two times per day. (R. at 137.) She noted that the medication helped to "dull the pain," but explained that it did not

-17-

completely resolve it. (R. at 137.) Young-Ligon noted that Underwood experienced allodynia with light touch along the left elbow and that she had difficulty within fine motor skills and using her left hand. (R. at 137.) She also explained that Underwood's employment as a bus driver exposed her to vibrations, which increased her lumbar pain. (R. at 137.) Underwood indicated that she was uncertain if she would be able to continue her job. (R. at 137.) Underwood reported that any extended sitting or standing exacerbated her pain. (R. at 137.) She commented that her pain started in her left lumbar spine and moved into the left hip and down the lateral and posterior aspect of the left leg into the heel and groin area. (R. at 137.) She also explained that her left arm pain started around the left cervical spine region into the left scapula and down the entire left arm into the hand and fingers. (R. at 137.) Upon examination, Underwood's back was positive for tenderness with palpation along the mid and lower lumbar spine and left sacroiliac joint. (R. at 137.) Young-Ligon's assessment noted chronic left sacroiliitis, left leg pain with possible radiculopathy and complex regional pain syndrome type II in the left upper extremity. (R. at 137.) Dr. Winikur agreed with Young-Ligon's assessment, but he discontinued Underwood's Lortab 5/500 mg prescription and continued her Lortab 7.5/500 mg prescription. (R. at 137.)

Underwood saw Dr. Winikur on December 7, 2004, and complained of pain down her left arm to her fingers, which emanated from the base of her neck. (R. at 133.) Dr. Winikur noted that it would be a good idea to have an MRI of the lumbar spine and cervical spine. (R. at 133.) Upon examination, Underwood was observed to be alert and oriented, but she was very tender over the sacroiliac joint. (R. at133.) Dr. Winikur noted that she had a positive Patrick sign and that she had "clear-cut"

-18-

sacroiliitis. (R. at 133.) Underwood was diagnosed with left sacroiliitis, left cervical radiculopathy and left lumbar radiculopathy. (R. at 133.) An MRI of the cervical and lumbar spine was ordered, and Underwood was again prescribed Lortab. (R. at 133.)

MRIs of the lumbar spine and cervical spine were performed on December 7, 2004. The MRI of the lumbar spine showed that the conus was visualized and demonstrated normal size and signal, with slight disc dehydration observed at L3-4 and L4-5. (R. at 135.) There was minimal bulging of the annulus fibrosis at L1-2 and at L2-3, with mild bulging of the annulus fibrosis at L3-4, L4-5 and L5-S1. (R. at 135.) No evidence of central canal stenosis or neural foraminal stenosis was noted and no focal disc protrusion was observed. (R. at 135.) The MRI of the cervical spine showed a cervical cord of normal size and signal, with a broad based central disc protrusion at the C6-7 level. (R. at 154.) This protrusion did not abut the cervical cord or the exiting nerves roots. (R. at 154.) There was no evidence of central canal stenosis or neural foraminal stenosis; however, minimal central disc protrusion was observed at C7-T1. (R. at 154.)

On March 16, 2005, Underwood presented to Dr. Winikur and complained of pain down her left arm and in her left sacroiliac joint. (R. at 132.) Underwood requested injections to treat the pain and Dr. Winikur noted that he would schedule an appointment to perform a left stellate ganglion block. (R. at 132.) Underwood saw Dr. Winikur again on March 21, 2005, at which time she reported pain associated with her left sacroiliitis. (R. at 131.) She also reported pain and discomfort in the left arm. (R. at 131.) Dr. Winikur opined that he did not think Underwood suffered from a full complex regional pain syndrome, but noted that she did have "quite a bit of

Case 2:07-cv-00062-GMW-PMS   Document 25   Filed 10/10/08   Page 19 of 56   Pageid#: 90

element of sympathetic mediated pain." (R. at 131.) Thus, Dr. Winikur performed a left stellate ganglion block. (R. at 131.) Underwood was released in good condition. (R. at 131.) Underwood also presented to Dr. Winikur on September 12, 2005, with pain in her left elbow. (R. at 344.) Dr. Winikur noted that Underwood was stable from her sacroiliitis and complex regional pain syndrome of the left upper extremity. (R. at 344.) Dr. Winikur renewed Underwood's Lortab prescription and noted that, at the time of the visit, Underwood had lost her job and was not working. (R. at 344.)

Underwood was treated periodically at Memorial Hospital from March 22, 2004, to October 6, 2004. On March 22, 2004, Underwood presented due to heavy vaginal bleeding. (R. at 338.) Following an examination, she was assessed with menorrhagia, fatigue, rhinosinusitis and weight gain despite exercise and dietary restriction. (R. at 337.) On April 19, 2004, Underwood presented complaining of, among other things, right arm soreness and pain. (R. at 320, 337.) She was diagnosed with probable superficial thrombophlebitis in the right antecubital fossa, menorrhagia and gastroesophageal reflux disease, ("GERD"). (R. at 320.) She was prescribed Cephalexin, ibuprofen, Provera and Prevacid. (R. at 320.) On April 26, 2004, Underwood was diagnosed with pelvic pain, memorrhagia, dysmenorrhea and dyspareunia. (R. at 321-22.) Thus, she underwent a fractional dilatation and curettage and diagnostic laparoscopy. (R. at 326-28.) The procedure showed no evidence of any inflammatory conditions that would explain Underwood's problems and there was no evidence of endometriosis. (R. at 326-27.) The patient was in excellent condition following the surgical procedure. (R. at 327.)

Underwood presented on May 30, 2004, with complaints of congestion, fever and a cough. (R. at 274.) The clinical impression noted acute bronchitis. (R. at 275.) A chest x-ray showed Underwood's heart size and configuration to be within normal limits for her age. (R. at 281.) Underwood's lungs were clear and there was no evidence of pleural fluid or pneumothorax. (R. at 281.) No acute abnormality of the bones was evident and there was no evidence of acute cardiopulmonary disease. (R. at 281.)

On June 2, 2004, Underwood was diagnosed with acute bronchitis and was prescribed Prednisone and Avelox. (R. at 319.) She returned on June 4, 2004, for a follow-up appointment, at which time she was again diagnosed with acute bronchitis and advised to finish the Prednisone and Avalox. (R. at 318-19.) She also was instructed to begin home use of a nebulizer and was prescribed Zopenex. (R. at 318.) Underwood presented on June 11, 2004, for another follow-up appointment. (R. at 318.) She was running a low-grade fever and was diagnosed with allergic bronchitis, which may have been exacerbated by her GERD. (R. at 318.) Underwood's Prevacid dosage was increased, she was placed on a fixed dosage of Prednisone and she was prescribed Guifenesin. (R. at 318.) She was advised to continue her nebulized Zopenex. (R. at 318.)

On October 6, 2004, Underwood presented with a chief complaint of abdominal pain. (R. at 272.) After an otherwise normal examination, Underwood was prescribed Nexium and Xanax. (R. at 273.) Underwood returned on February 9, 2005, and complained of a sore throat, fever and a cough. (R. at 270.) Dr. James M. Isernia, M.D., noted that Underwood was in moderate distress, due to symptoms

such as chest congestion, cough, chest pain, wheezing and dyspnea. (R. at 270.) The clinical impression was acute asthmatic bronchitis and acute sinusitis. (R. at 271.) Underwood was prescribed Xopenex, Avelox and Atrovert. (R. at 271.)

On February 12, 2005, Underwood presented to the Morehead Memorial Hospital emergency room, complaining of dizziness and numbness to the left side of her face, as well as sweating and pain across the shoulder. (R. at 149.) She indicated that she had seen her doctor a couple of days prior to presenting to the emergency room and noted that she was given medication for bronchitis. (R. at 149.) Upon physical examination, Underwood was awake, alert and did not appear to be in any distress, but she was reportedly anxious. (R. at 149.) She showed a full range of motion in the neck, with no tenderness. (R. at 149.) Underwood moved all extremities well and no focal neurological deficit was noted. (R. at 149.) A chest x-ray was unremarkable, as it showed the cardiac silhouette to be normal in size and shape. (R. at 152.) It further revealed that the lungs were free of infiltrates and no pleural or mediastinal lesions were observed. (R. at 152.) The x-ray did reveal minimal degenerative spondylosis compatible with Underwood's age. (R. at 152.) No acute process was observed. (R. at 152.) An electrocardiogram, ("EKG"), showed a normal sinus rhythm and no acute ST-T wave abnormalities. (R. at 149.) Underwood was diagnosed with an upper respiratory infection, anxiety and a possible reaction to medication. (R. at 149.) She was advised to follow up with her doctor and was given Ativan. (R. at 150.) Shortly thereafter, on February 14, 2005, Underwood sought treatment at Patrick County emergency room, complaining of an anxious feeling and numbness to the left side of her face. (R. at 204.) In addition, Underwood presented with labored breathing, a cough and congestion. (R. at 204.)

-22-

She was diagnosed with an anxiety attack and bronchitis. (R. at 204.)

On February 16, 2005, Underwood was admitted to Memorial Hospital as a result of failure of outpatient therapy for sinusitis and asthmatic bronchitis. (R. at 296-98.) Dr. Isernia noted that Underwood had previously been treated for anxiety, but he disagreed. (R. at 296.) Instead, he opined that she had sinusitis and asthmatic bronchitis and that she needed to be treated in the hospital and also needed to be further evaluated. (R. at 296.) Upon examination, Underwood was alert and oriented and was noted to be in moderate respiratory distress. (R. at 297.) An examination of the lungs indicated decreased air movement with scattered wheezes and rhonchi. (R. at 297.) Dr. Isernia reported a grossly intact musculoskeletal and neurologic examination. (R. at 298.) His assessment included acute asthmatic bronchitis, respiratory infection, acute sinusitis, viral syndrome, asthma, paroxysmal atrial tachycardia, mild dehydration and GERD. (R. at 298.) Underwood was to be continued on the same treatment plan and was to be given antibiotics of Biaxin XL and Rocephin, cough medicines, respiratory treatment, oxygen and steroids. (R. at 298.) On February 16, 2005, a CT scan of the chest was performed due to Underwood's history of sinusitis and bronchitis, which revealed a stable chest without evidence of acute cardiopulmonary disease. (R. at 315.) The findings indicated pansinusitis that involved all the paranasal sinuses except the left sphenoid sinus. (R. at 314.) The findings further suggested possible chronic sinusitis. (R. at 314.)

Upon discharge on February 18, 2005, Dr. Isernia's final diagnosis included improved severe asthmatic bronchitis, pansinusitis, hyperglycemia with a distinct

-23-

possibility of type II diabetes, failure of outpatient therapy, viral syndrome, resolved dehydration, GERD, depression and anxiety. (R. at 293.) She was ambulatory and able to undergo activities of daily living on her own. (R. at 294.) Dr. Isernia noted that Underwood felt well, indicating that she felt much better than she did at the time of admission. (R. at 294.) Underwood was instructed to continue her nebulizers, Prednisone, Biaxin XL and Flonase, and was prescribed Nexium, Tenormin, Allegra, Lexapro and Ativan. (R. at 294.) She was placed on a no added sweets diet and was instructed that her activities should be limited. (R. at 294.)

On March 3, 2005, Underwood presented for a follow-up appointment for asthma and bronchitis. (R. at 266.) Upon examination, Underwood was observed to be in mild distress, noting that the previously prescribed Allegra was ineffective. (R. at 266.) In addition, Underwood requested that her Lexapro prescription be discontinued. (R. at 266.) The treatment records noted no abnormal findings, and the clinical impression was allergic rhinitis and pansinusitis, increased blood pressure and glucose levels and a decreased mood. (R. at 267.) Underwood was prescribed Singulair. (R. at 267.) Another CT scan was performed on March 15, 2005, and was compared to the previous February 2005 scan. (R. at 316.) The scan showed interval improvement in the overall appearance of the paranasal sinuses. (R. at 316.)

Underwood presented on April 4, 2005, due to suspected depression. (R. at 308.) Underwood indicated that she was under a lot of stress and reported excessive sleeping. (R. at 308.) She also reported that she had experienced facial numbness, which caused her face to "draw up" to the side. (R. at 308.) Underwood stated that she cried very easily, but was not easily angered. (R. at 308.) She indicated that she

-24-

was very shaky at times and that she was having difficulty with her daughter. (R. at 308.) In addition, she reported frequent headaches. (R. at 308.) Underwood was diagnosed with depression with both endogenous and exogenous contributing factors. (R. at 308.) She was prescribed Lexapro and advised to follow up in one month. (R. at 308.) On April 11, 2005, Underwood was prescribed Xanax. (R. at 308.)

Underwood returned on April 18, 2005, complaining of shortness of breath, anxiety attacks and left sided neck swelling. (R. at 264.) A review of systems indicated fatigue and headaches. (R. at 264.) The treatment notes also indicated that Underwood showed a decreased range of motion, poor eye contact and tearfulness. (R. at 265.) She was diagnosed with hypertension, depression, anxiety and panic attacks. (R. at 265.) Underwood was prescribed Buspar and advised to follow up with Dr. Isernia. (R. at 265.) Underwood presented again on April 25, 2005, and complained of left lower leg pain. (R. at 262.) She reported increased pain with ambulation and weight bearing, and also rated her pain as five out of 10. (R. at 262.) She was observed to be in mild distress, but her range of motion was normal. (R. at 262.)

On July 6, 2005, Underwood was examined prior to a scheduled endoscopy. (R. at 260-61.) The preoperative diagnosis noted persistent epigastric pain and substernal burning with a history of helicobacter pylori-positive gastritis. (R. at 260.) A physical examination was unremarkable. (R. at 261.) The endoscopy was performed at Memorial Hospital on July 7, 2006, and revealed no evidence of ulceration or significant inflammation. (R. at 259.) No definite hernia could be identified, but there was mild inflammation of a very terminal esophagus. (R. at 259.)

There was no reflux detected during the procedure. (R. at 259.)

Underwood was treated at Primary Care Associates of Martinsville from February 21, 2005, to September 24, 2005. (R. at 222-39.) On February 21, 2005, Underwood's primary care physician, Dr. Isernia, completed a form certifying Underwood's need for time off pursuant to the Family and Medical Leave Act of 1993. (R. at 238-39.) According to Dr. Isernia, due Underwood's condition and the February 2005 hospitalization, it was necessary for her to either work only intermittently or to work less than a full schedule for a period of two weeks. (R. at 238.) He noted that Underwood's treatment regimen included respiratory treatments, oxygen, antibiotics and steroids. (R. at 239.) Between May 31, 2005, and June 19, 2006, Underwood was treated by Dr. Isernia and his nurse practitioner for allergy and sinus related symptoms, as well as abdominal tenderness, indigestion, nausea, left leg pain and left arm pain. (R. at 224-36.) Underwood was diagnosed with chronic sinusitits, rhinitis, GERD, obesity, mild non-insulin dependent diabetes mellitus, fibromyalgia, left elbow pain, left thigh pain, hypertension, allergies, asthma, dyslipidemia and panic attacks. (R. at 224-36.) Underwood was prescribed medication such as amoxicillin, Zyrtec, Biaxin, Ultracet, Skelaxin, Nasonex, Atenelol, Percocet and Prinivil. (R. at 224-36.) During the above-mentioned time frame, Underwood also presented with complaints of back pain, abdominal pain, irregular menstruation and urinary symptoms. (R. at 375-76, 379-80.) Underwood was advised to increase her fluid intake and was referred to a urologist, as well as an obstetrics and gynecology specialist. (R. at 375-76, 380.)

Due to Underwood's consistent sinus related problems, Dr. Isernia referred her

-26-

to Dr. John Selman, M.D., who treated Underwood routinely from February 23, 2005, to March 6, 2006. (R. at 240-47, 249-56, 345-48.) During this time period, Underwood presented with allergy and sinus related symptoms and was diagnosed with allergic rhinitis, nasal congestion, allergic conjunctivitis, perennial allergic rhinitis, pansinusitis, bronchitis, chronic sinusitis, seasonal allergies and acute maxillary sinusitis. (R. at 240-47, 345-48.) Dr. Selman treated Underwood's condition with allergy shots and prescribed medication such as amoxicillin, Zyrtec, Singulair, Flonase, Mucinex, Omnicef, Avelox, Bactroban, Robintussin-AC, Allegra D, Clarinex, Advair. (R. at 240-47, 345-48.)

Underwood was referred to Dr. Holyfield, an obstetrics and gynecology specialist, where she sought treatment from March 31, 2006, until June 15, 2006. (R. at 353-60.) Underwood reported vaginal bleeding and indicated that she was interested in undergoing a hysterectomy. (R. at 359.) The clinical impression indicated abnormal uterine bleeding, a left adnexal cyst, obesity, fibromyalgia and chronic neck and back pain. (R. at 359.) A biopsy of the cyst yielded normal results and Dr. Holyfield noted an improvement in the condition of the cyst. (R. at 357-58.) Underwood also was treated by Dr. Andrew G. Gehrken Jr., M.D., who diagnosed Underwood with a midline cystocele, female stress incontinence, nocturia and frequent urination. (R. at 351.) He ordered a renal scan due to Underwood's complaints of incontinence and nocturia, which returned negative results. (R. at 349-52.) A hysterectomy was performed in May 2006 by Dr. Gehrken and the procedure went well, with no post-operative problems or complaints, other than the abdominal pain and leg pain that was present prior to the procedure. (R. at 354-57.)

-27-

Underwood presented to Dr. Keshavpal Reddy, M.D., from April 25, 2005, to November 25, 2005.[10] (R. at 339-41.) These medical records appear to indicate that Underwood was diagnosed with a major depressive disorder. (R. at 341.) In addition, it appears that Dr. Reddy prescribed medications such as Lexapro, Xanax, Buspar and Ativan. (R. at 339-41.)

On July 27, 2005, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF.) (R. at 157-71.) Tenison determined that a residual functional capacity assessment was needed and found that Underwood suffered from a coexisting nonmental impairment that required referral to another medical specialty. (R. at 157.) Tenison indicated that Underwood showed symptoms of an affective disorder and an anxiety-related disorder; however, he did not make findings that satisfied the required diagnostic criteria. (R. at 160, 162.) He did note that Underwood suffered from sleep disturbance, decreased energy and recurrent, severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (R. at 162.) Tenison found that Underwood was mildly limited in her activities of daily living and moderately limited in maintaining concentration, persistence or pace. (R. at 167.) Tenison noted no limitations as to Underwood's ability to maintain social functioning and noted no episodes of decompensation. (R. at 167.) Tenison concluded that Underwood's allegations as to her mental condition were not fully credible and determined that she was capable of performing simple, nonstressful work. (R. at 170.)

---

[10]The medical records from these visits are largely illegible.

On July 29, 2005, Dr. Robert O. McGuffin, M.D., completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 172-81.) Dr. McGuffin found that Underwood could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 173.) Dr. McGuffin also found that Underwood was able to sit and stand and/or walk for a total of about six hours in a typical eight-hour workday. (R. at 173.) Dr. McGuffin determined that Underwood was limited in her ability to push and/or pull with her left upper extremity. (R. at 173.) Specifically, Dr. McGuffin found that Underwood was limited in her ability to reach in all directions, including overhead, with her left extremity. (R. at 177.) Underwood was found to be unlimited in her ability to handle, finger and feel with each extremity, and Underwood was found to be unlimited in her ability to reach in all directions with her right extremity. (R. at 177.) No postural, visual, communicative or environmental limitations were noted. (R. at 176-78.) Based upon the evidence reviewed, Dr. McGuffin concluded that Underwood's allegations appeared to be partially credible, noting that she should be capable of performing jobs that did not require heavy lifting or frequent overhead lifting with the left upper extremity. (R. at 174.) Dr. McGuffin's findings were reviewed and affirmed by Dr. Richard M. Surrusco, M.D., on October 12, 2005. (R. at 181.)

Tenison completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on July 29, 2005. (R. at 182-85.) Tenison found that Underwood was moderately limited in her ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance and be

-29-

punctual within customary tolerances, the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors and the ability to respond appropriately to changes in the work setting. (R. at 182-83.) Tenison also determined that Underwood was in between the not significantly limited and moderately limited categories in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and her ability to travel in unfamiliar places or use public transportation. (R. at 183.) In all other categories, Tenison found that Underwood was either not significantly limited or that there was no evidence of limitations. (R. at 182-83.)

On August 4, 2005, Underwood again sought treatment at the Patrick County Hospital emergency room with complaints of epigastric pain and an anxiety attack. (R. at 203.) Underwood was diagnosed with gastritis, GERD, a hiatal hernia, atypical chest pain and panic/anxiety attack. (R. at 203.) An EKG revealed normal sinus rhythm and a probable anteroseptal infarction. (R. at 202.) A chest x-ray showed no evidence of active lung disease or any unexpected change since the previous chest x-ray. (R. at 186.)

On August 25, 2005, Underwood sought treatment at the Bone & Joint Center, Inc., where she saw Dr. John P. McGee, M.D. (R. at 207.) Underwood presented for an evaluation of her left elbow pain. (R. at 207.) She explained that the pain had continued for several years and that Dr. Winikur had referred her for further evaluation. (R. at 207.) She advised that she treated her pain with Lortab and

explained that the pain occurred along the lateral aspect of the left elbow and that it also traveled up to the shoulder. (R. at 207.) Underwood reported no significant numbness or tingling. (R. at 207.) She indicated that she had taken anti-inflammatories, but stated that they had not helped. (R. at 207.) Dr. McGee noted a history of fibromyalgia. (R. at 207.) Upon examination, no tenderness to palpation was observed over the acromioclavicular, acromion, clavicle, proximal humerus, forearm, wrist or hand distally. (R. at 207.) Furthermore, there was no point tenderness over the lateral epicondyle of the left elbow and no medial tenderness. (R. at 207.) Dr. McGee noted that pain was shown with forced dorsiflexion and supination of the forearm. (R. at 207.) Underwood's pulses were 2+ and her motor and sensory were intact. (R. at 207.) X-rays revealed no acute bony abnormality. (R. at 207.) Dr. McGee administered an injection of Xylocaine and Kenalog into the lateral epicondylar region. (R. at 207.) Dr. McGee diagnosed Underwood with lateral epicondylitis and advised her to follow up in three to four weeks. (R. at 207.)

Underwood returned to the Bone & Joint Center on December 14, 2005, for a follow-up visit regarding her left arm. (R. at 362.) Underwood reported that her condition had not improved and stated that her pain continued. (R. at 362.) She also denied any right sided pain. (R. at 362.) A physical examination showed no erythema, ecchymosis or swelling. (R. at 362.) Point tenderness was present over the lateral epicondyle and there was pain with dorsiflexion and supination of the wrist and forearm. (R. at 362.) Underwood's sensation was found to be intact, but Underwood claimed that she experienced numbness. (R. at 362.) No significant right side tenderness was noted. (R. at 362.) The clinical impression indicated lateral epicondylitis, which was resistant to conservative care. (R. at 362.) Underwood was

Case 2:07-cv-00062-GMW-PMS    Document 25    Filed 10/10/08    Page 31 of 56    Pageid#: 102

advised to follow up and was scheduled for a February 2006 modified Nirschl procedure. (R. at 362.)

On August 29, 2005, Underwood presented to Therapy Associates to begin physical therapy. (R. at 214-15.) The treatment notes indicate that, at the time of this visit, Underwood was advised to try to do as much as she could within her pain tolerance. (R. at 214.) In addition, prior to her work injury in December 2001, she had full function of her left upper extremity, but since the injury she has had difficulty sleeping due to pain and limited use of the left hand. (R. at 214.) Underwood described her pain as constant, burning, throbbing, shooting, aching and stabbing, noting that the pain primarily occurred in the elbow, but also in the neck and hand. (R. at 214.) She explained that the pain worsened with wrist extensions and supination or pronation. (R. at 214.) Underwood rated her usual pain from eight out of 10 to 10 out of 10. (R. at 214.) Underwood's problems were listed as pain, limited function and limited range of motion and strength. (R. at 215.) The treatment plan included therapeutic exercises and activity, as well as icing for pain and an ultrasound. (R. at 215.) Short term goals included full elbow extension and the ability to pick up two pound objects, with long term goals including reduction to minimal/moderate pain and the ability to pick up five pound objects. (R. at 215.) The assessment noted long standing pain/dysfunction and her rehabilitation potential was noted as good. (R. at 215.) Treatment was recommended for three times per week for three weeks. (R. at 215.) Underwood returned on August 30, 2005, and complained of elbow pain, noting that her pain increased with elbow or wrist extension. (R. at 213.) Underwood also reported that she could not straighten her elbow. (R. at 213.) The treatment notes indicate that therapeutic procedures were

-32-

performed and the assessment noted that stretching and exercising would be gradually added to the treatment regimen, as tolerated by Underwood. (R. at 213.)

On December 5, 2005, Dr. Winikur completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 342-44.) Dr. Winikur found that Underwood could occasionally lift and/or carry items weighing up to seven pounds and that she could frequently lift and/or carry items weighing up to three pounds. (R. at 342.) In addition, Dr. Winikur determined that Underwood could stand and/or walk for a total of six hours in a typical eight-hour workday and that she could stand and/or walk for one hour without interruption. (R. at 342.) He also found that she was able to sit for a total of two hours in a typical eight-hour workday and that she could sit for one half hour without interruption. (R. at 342.) Dr. Winikur reported that Underwood retained the ability to frequently climb, but that she could never stoop, kneel, crouch or crawl. (R. 343.) Furthermore, he noted that Underwood's ability to push and/or pull was affected by her impairments, but that her abilities to reach, handle, feel, see, hear and speak were found to be unaffected by her impairments. (R. at 343.) Dr. Winikur also found that Underwood's activities around heights, moving machinery, temperature extremes, humidity and vibration should be limited. (R. at 343.) No other environmental restrictions were noted. (R. at 343.) Dr. Winikur indicated that his findings were supported by clinical examination, as well as the FCE report. (R. at 342-43.)

On January 9, 2006, Underwood presented to Dr. Winikur with chief complaints of generalized body pain and left shoulder and arm pain. (R. at 366.) Specifically, she reported low back pain, generalized body aches and pains, left

-33-

shoulder and arm pain and neck pain. (R. at 366.) Underwood described the pain as aching, stabbing, throbbing, shooting and burning. (R. at 366.) Underwood rated her pain as five out of 10 with her medications, but as 10 out of 10 without her medications. (R. at 366.) Dr. Winikur noted that Underwood took Lortab 7.5/500 mg for her pain, and she requested another medication or, in the alternative, to increase her Lortab dosage. (R. at 366.) Underwood claimed that bending, standing, sitting or walking for extended periods worsened her pain, but acknowledged that rest and medication alleviated the pain somewhat. (R. at 366.) She also reported difficulty sleeping, which she attributed to the pain in her lower back and left hip and leg. (R. at 366.) Underwood opined that her treatment regimen had helped her maintain her activities of daily living, but she noted that she was somewhat limited as to her daily functional capacity due to the generalized body pain and left upper extremity pain and discomfort. (R. at 366.) After an unremarkable examination, Underwood was diagnosed with chronic lumbar pain, sacroiliitis, complex regional pain syndrome type I of the left upper extremity and generalized body pain. (R. at 366.) She was advised to continue taking Lortab, as Dr. Winikur stated that she could take one and a half tablets four times per day, as needed for pain. (R. at 366.)

Underwood again saw Dr. Winikur on April 21, 2006, reporting low back pain and left hip and leg pain. (R. at 364.) Her description of the pain and its effect on her activities of daily living were unchanged. (R. at 364.) Underwood indicated that her sleep had improved due to taking Xanax. (R. at 364.) Underwood was diagnosed with chronic lumbar pain, chronic sacral ileitis, complex regional pain syndrome type I of the left upper extremity and generalized body and joint pain. (R. at 364.) Dr. Winikur recommended that Underwood continue the same treatment and pain

management medication, prescribing her Lortab 7.5/500 mg. (R. at 364.) The treatment notes indicate that Underwood was stable on her medication and that Underwood felt as if she was receiving adequate pain relief. (R. at 365.) Underwood was instructed to return in three months. (R. at 365.)

On July 17, 2006, Dr. Reddy completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 388-90.) Dr. Reddy determined that Underwood had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment with the public and deal with work stresses. (R. at 389.) Dr. Reddy also found that Underwood had poor or no ability to interact with supervisors, function independently or to maintain attention and concentration. (R. at 389.) Furthermore, Dr. Reddy, in evaluating Underwood's ability to make performance adjustments, found that Underwood had a fair ability to understand, remember and carry out simple, detailed and complex job instructions. (R. at 390.) He also found that, in terms of making personal/social adjustments, Underwood had a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 390.) Dr. Reddy concluded that Underwood was capable of managing her benefits in her best interest. (R. at 390.)

Dr. Winikur completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on July 7, 2007. (R. at 408-49.) Dr. Winikur found that Underwood was able to occasionally lift and/or carry items weighing up to 15 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 408.) He noted that these limitations were supported by medical findings relating to left

-35-

shoulder, elbow and wrist pain/dysfunction. (R. at 408.) In addition, Dr. Winikur determined that Underwood could sit and stand/walk for a total of eight hours in a typical eight-hour workday, noting that she would only do so for two hours without interruption. (R. at 408.) He indicated that the medical findings as to Underwood's lumbar pain, leg pain and sacroiliitis supported his assessment. (R. at 408.) Dr. Winikur found that Underwood could occasionally balance, but that she could never climb, stoop, kneel, crouch or crawl. (R. at 409.) While he noted no limitations as to Underwood's ability to feel, see, hear or speak, he found that Underwood was limited in her ability to reach, handle and push/pull. (R. at 409.) Lastly, Dr. Winikur noted environmental restrictions as to heights, moving machinery and temperature extremes. (R. at 409.)

Dr. Winikur also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on July 7, 2007. (R. at 410-11.) Dr. Winikur determined that Underwood had an unlimited/very good ability to follow work rules, a good ability to relate to co-workers and a fair ability to deal with the public, use judgment with the public, interact with supervisors and function independently. (R. at 410.) However, he determined that Underwood had a poor or no ability to deal with work stresses or maintain attention and concentration. (R. at 410.) Dr. Winikur found that Underwood had a good ability to understand, remember and carry out complex, detailed and simple job instructions. (R. at 411.) Lastly, Dr. Winikur found that Underwood had a good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 411.)

-36-

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 20, 2006, the ALJ denied Underwood's claims.

Case 2:07-cv-00062-GMW-PMS   Document 25   Filed 10/10/08   Page 37 of 56   Pageid#: 108

(R. at 12-26.) The ALJ found that Underwood met the insured status requirements of the Act for DIB purposes through June 30, 2010. (R. at 17.) The ALJ also found that Underwood had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 17.) The ALJ determined that the medical evidence established that Underwood suffered from severe impairments, namely left lateral epicondylitis, complex regional pain syndrome, bulging discs in the lumbar spine, small disc protrusion at C6-7 and C7-T1, sacroiliitis and a depressive disorder. (R. at 17-19.) However, the ALJ found that Underwood did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ further found that Underwood retained the residual functional capacity to perform simple, non-stressful work that did not require lifting and carrying of items weighing more than seven pounds occasionally or three pounds frequently. (R. at 20.) Furthermore, the ALJ determined that Underwood was limited to standing and walking for one hour at a time, sitting for more than one-half hour at a time, for a total of six hours and two hours, respectively, during a typical eight-hour workday. (R. at 20.) The ALJ also determined that Underwood was unable to perform any stooping, kneeling, crouching, crawling, pushing and pulling, and that she should avoid work around humidity and vibrations. (R. at 20.) The ALJ found that Underwood was unable to perform any of her past relevant work and that transferability of job skills was not material to this determination of disability because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Underwood possessed transferable job skills. (R. at 24.) Based upon Underwood's age, education, work experience and residual functional capacity, the ALJ determined that there were other jobs existing in significant numbers within the national economy that she could perform, including

-38-

jobs as a production inspector, an amusement attendant, a mechanical assembler and a file clerk. (R. at 24-25.) Thus, the ALJ concluded that Underwood was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Underwood argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 13-18.) Specifically, Underwood claims that the ALJ simply ignored certain limitations noted by the state agency physicians and psychologists, thereby failing to evaluate and analyze each medical opinion and sufficiently explain the weight given to that evidence. (Plaintiff's Brief at 13-15.) Underwood also argues that the ALJ failed to accord proper weight to certain examining and treating physicians. (Plaintiff's Brief at 15-18.) Lastly, Underwood argues that the Commissioner failed to sustain the burden of establishing that there is work within the national economy that Underwood can perform. (Plaintiff's Brief at 18-20.) In particular, Underwood claims that the ALJ failed to pose a proper hypothetical question to the vocational expert. (Plaintiff's Brief at 18-20.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently

explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Underwood first argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 13-18.) In making this argument, Underwood contends that although the ALJ stated that he concurred with the state agency psychologist's opinion regarding Underwood's mental limitations, he failed to properly discuss and/or include these limitations within his residual functional capacity determination. (Plaintiff's Brief at 13.) Moreover, according to Underwood, because of the ALJ's failure to include these limitations in his residual functional capacity finding, the ALJ therefore failed to adequately explain his apparent rejection of the mental limitations noted by the state agency psychologist. (Plaintiff's Brief at 13-14.) I disagree.

As stated above, it is this court's duty to determine whether substantial

evidence supports the Commissioner's decision. In order to properly make that determination, the court is required to examine whether the ALJ has analyzed all of the relevant evidence of record and whether the ALJ sufficiently explained his findings and his rationale in crediting that evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicity that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). As explained in *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)),

> [t]he courts, however, face a difficult talk in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

In this case, the ALJ determined that Underwood retained the residual functional capacity to perform simple, non-stressful work that did not require lifting and carrying of items weighing more than seven pounds occasionally or three pounds frequently. (R. at 20.) Furthermore, the ALJ determined that Underwood was limited to standing and walking for one hour at a time, sitting for more than one-half hour at a time, for a total of six hours and two hours, respectively, during a typical eight-hour workday. (R. at 20.) The ALJ also determined that Underwood was unable to perform any stooping, kneeling, crouching, crawling, pushing and pulling, and that she should avoid work around humidity and vibrations. (R. at 20.)

-41-

The mental limitations that Underwood claims the ALJ failed to include or discuss are contained in the MRFC completed by Tenison on July 29, 2005. (R. at 182-85.) Tenison found that Underwood was moderately limited in her ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors and the ability to respond appropriately to changes in the work setting. (R. at 182-83.) Tenison also determined that Underwood was in between the not significantly limited and moderately limited categories in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and her ability to travel in unfamiliar places or use public transportation. (R. at 183.) In all other categories, Tenison found that Underwood was either not significantly limited or that there was no evidence of limitations. (R. at 182-83.)

In the ALJ's opinion, he never specifically discussed the findings contained in the MRFC completed by Tenison on July 29, 2005. However, he did reference the PRTF, which Tenison completed on July 27, 2005. In that assessment, Tenison found that Underwood showed symptoms of an affective disorder and an anxiety-related disorder; however, he did not make findings that satisfied the required diagnostic criteria. (R. at 160, 162.) He did note that Underwood suffered from sleep disturbance, decreased energy and recurrent, severe panic attacks manifested by a

-42-

sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (R. at 162.) Tenison found that Underwood was mildly limited in her activities of daily living and moderately limited in maintaining concentration, persistence or pace. (R. at 167.) Tenison noted no limitations as to Underwood's ability to maintain social functioning and noted no episodes of decompensation. (R. at 167.) Tenison concluded that Underwood's allegations as to her mental condition were not fully credible and determined that she was capable of performing simple, nonstressful work. (R. at 170.)

The ALJ stated that he concurred with the state agency psychologists who determined that Underwood's mental limitations did not rise to the level of severity to meet the criteria for the corresponding medical listing. (R. at 20.) In justifying his residual functional capacity determination, the ALJ noted that his finding was consistent with the state agency psychological opinions regarding Underwood's mental functioning and the record as a whole. (R. at 23.) The ALJ further explained that his residual functional capacity finding was "relatively consistent" with each opinion contained within the record, noting that no opinion was rejected outright. (R. at 23.) However, without fully addressing each opinion, specifically the July 29, 2005, MRFC, which contained several moderate limitations that related to Underwood's mental capacity in areas such as understanding and memory, sustained concentration and persistence, social interaction and the ability to adapt, it is difficult for the court to determine the precise weight given to this particular opinion.

However, despite the ALJ's vague references to the MRFC completed by

-43-

Tenison, the record shows that Tenison made a finding that Underwood was capable of performing simple, non-stressful work, a finding that is clearly consistent with the ALJ's residual functional capacity determination. This finding was included in a PRTF conducted on the same day as the MRFC. Thus, had Tenison thought that the moderate limitations noted in the MRFC would affect Underwood's ability to perform simple, non-stressful work, he certainly would have indicated that in the evaluation. After a review of the record, it is apparent that failure to thoroughly discuss the July 29, 2005, MRFC constitutes harmless error at best, as it did not prohibit this court from determining whether the ALJ's findings were supported by substantial evidence. *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) (holding that errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001)). Thus, for the reasons stated above, the court finds that the ALJ did not ignore the findings of the state agency psychologist.

Underwood also argues that the ALJ ignored the state agency opinions as to Underwood's physical limitations. (Plaintiff's Brief at 14-15.) Underwood argues that the ALJ did not properly consider the PRFC completed by Dr. McGuffin on July 29, 2005, which was affirmed by Dr. Surrusco on October 12, 2005. (Plaintiff's Brief at 14.)

On July 29, 2005, Dr. McGuffin found that Underwood could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 173.) Dr. McGuffin also found that Underwood

-44-

was able to sit and stand and/or walk for a total of about six hours in a typical eight-hour workday. (R. at 173.) Dr. McGuffin determined that Underwood was limited in her ability to push and/or pull with her left upper extremity. (R. at 173.) Specifically, Dr. McGuffin found that Underwood was limited in her ability to reach in all directions, including overhead, with her left upper extremity. (R. at 177.) Underwood was found to be unlimited in her ability to handle, finger and feel with each extremity, and Underwood was found to be unlimited in her ability to reach in all directions with her right extremity. (R. at 177.) No postural, visual, communicative or environmental limitations were noted. (R. at 176-78.) Based upon the evidence reviewed, Dr. McGuffin concluded that Underwood's allegations appeared to be partially credible, noting that she should be capable of performing jobs that did not require heavy lifting or frequent overhead lifting with her left upper extremity. (R. at 174.) These findings were reviewed and affirmed by Dr. Surrusco. (R. at 181.)

Underwood contends that these two reviewing physicians concluded that she was unable to perform *any* pushing and/or pulling with the left upper extremity and that she was limited in her ability to reach in all directions, including overhead with the left upper extremity. (Plaintiff's Brief at 14.) Underwood also points out that the ALJ erred by only briefly mentioning the state agency physicians' findings as to overhead reaching and that the ALJ failed to include this limitation in his residual functional capacity determination. (Plaintiff's Brief at 14.) However, this is not an accurate representation of the state agency physicians' opinions. As noted above, the state agency physicians found that Underwood was limited in her ability to push and/or pull with her left upper extremity, including overhead reaching, concluding

-45-

that she was capable of performing jobs that did not require heavy lifting or frequent overhead lifting with the left upper extremity. (R. at 174, 177.) Notably, the findings did not say that Underwood could not perform *any* lifting; instead, the state agency physicians simply limited that activity. Furthermore, the state agency physicians agreed that Underwood was unlimited in her ability to reach in all directions with her right extremity. (R. at 177.) In addition, no postural limitations were noted. (R. at 176.)

Not only has Underwood misrepresented the ALJ's findings, but she has failed to realize that the limitations that she referenced are at least partially accounted for in the ALJ's residual functional capacity determination. The ALJ plainly stated in his opinion that Underwood was unable to perform pushing and pulling. (R. at 20.) Thus, despite the state agency physicians' opinions that Underwood was merely limited in her ability to push and/or pull, the ALJ gave her the benefit of the doubt and found that she could not perform these activities. In my opinion, the ALJ fully accounted for any limitation regarding Underwood's ability to push and/or pull and reach overhead. The ALJ determined that Underwood was capable of performing less than a full range of sedentary work. (R. at 20.) According to the regulations, sedentary work involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files. ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary . . . . Jobs are sedentary if walking and standing are required occasionally . . . .

*See* 20 C.F.R. §§ 404.1567(a); 416.967(a) (2008). According to Social Security

-46-

Ruling 96-9p, if an individual is unable to lift 10 pounds or occasionally lift the items noted above, then the sedentary occupational base will be eroded. *See* S.S.R. 96-9p, (July 2, 1996). In addition, an inability to lift or carry more than one or two pounds will erode the occupational base significantly. *See* S.S.R. 96-9p, (July 2, 1996). However, in the case at hand, the ALJ determined that Underwood could lift seven pounds occasionally and three pounds frequently. (R. at 20.) Thus, it is clear that, based upon these limitations, the occupational base is not significantly eroded; instead, based upon her limitations, it is intact. Moreover, the vocational expert was able to identify jobs that would be available to an individual with limitations as to pushing and/or pulling, as well as the inability to reach overhead with the left upper extremity. There is nothing within the definition of sedentary work nor any evidence to suggest that the jobs identified by the vocational expert would require significant pushing and/or pulling or frequent overhead reaching with the left hand only. Thus, I am of the opinion that the ALJ did not err by failing to specifically include the overhead reaching limitation in his finding, as it was accounted for by limiting Underwood to less than a full range of sedentary work.

Underwood also argues that the ALJ erred by not according proper weight to the opinions of Underwood's examining and treating physicians, namely Dr. Winikur and Dr. Reddy. (Plaintiff's Brief at 15-18.) Underwood claims that the ALJ completely ignored the environmental restrictions included in a Medical Assessment Of Ability To Do Work-Related Activities (Physical) completed by Dr. Winikur. (Plaintiff's Brief at 15.) In addition, Underwood argues that the ALJ failed to accord proper weight to a Medical Assessment Of Ability To Do Work-Related Activities (Mental) completed by Dr. Reddy and the December 9, 2003, FCE. (Plaintiff's Brief

-47-

at 15-18.)  This argument is without merit.

It is well settled that the ALJ is required to consider objective medical facts and the opinions and diagnoses of both treating and examining professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983).  The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008).  However, despite this general rule, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[11]  In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

First, I will address the findings of Underwood's treating psychiatrist, Dr. Reddy.  On July 17, 2006, Dr. Reddy completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental).  (R. at 388-90.)  Dr. Reddy determined that Underwood had a fair ability to follow work rules, relate to co-workers, deal with the

---

[11]*Hunter* was superceded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

-48-

public, use judgment with the public and deal with work stresses. (R. at 389.) Dr. Reddy also found that Underwood had poor or no ability to interact with supervisors, function independently or to maintain attention and concentration. (R. at 389.) Furthermore, Dr. Reddy, in evaluating Underwood's ability to make performance adjustments, found that Underwood had a fair ability to understand, remember and carry out simple, detailed and complex job instructions. (R. at 390.) He also found that, in terms of making personal/social adjustments, Underwood had a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 390.) Dr. Reddy concluded that Underwood was capable of managing her benefits in her best interest. (R. at 390.)

In assessing these findings, it is necessary to note that Dr. Reddy's brief treatment notes do not reveal any information to support such limitations. Underwood was treated by Dr. Reddy from April 25, 2005, to November 25, 2005. (R. at 339-41.) These medical records are largely illegible, but appear to indicate that Underwood was diagnosed with a major depressive disorder, which was accounted for in the ALJ's findings. (R. at 341.) In addition, it appears that Dr. Reddy prescribed medications such as Lexapro, Xanax, Buspar and Ativan. (R. at 339-41.) There is insufficient evidence within Dr. Reddy's treatment notes to support the findings he noted in the July 17, 2006, assessment. Furthermore, the other mental evaluations and assessments contained in the record do not reveal limitations consistent with Dr. Reddy's findings. Therefore, because Dr. Reddy's assessment was inconsistent with his own treatment notes and the other mental evaluations within the record, the ALJ was justified in not according significant weight to his opinion.

-49-

*See Craig*, 76 F.3d at 590.

Underwood also argues that the ALJ failed to accord proper weight to the FCE ordered by Dr. Winikur and the environmental limitations noted by Dr. Winikur on December 12, 2005, at which time he found that Underwood should be restricted as to exposure to heights, moving machinery and temperature extremes. (Plaintiff's Brief at 15-18.) The court notes that the failure to include the environmental limitations noted by Dr. Winikur is of no consequence, as the ALJ did not adopt Dr. Winikur's findings. Moreover, the inclusion of the environmental limitations identified by Dr. Winikur would not impact the determination of whether Underwood could perform work. It should be noted that the vocational expert was asked to consider the evaluation by Dr. Winikur and he opined that such an individual would be capable of performing sedentary work, including the occupations of an amusement attendant, a file clerk and a mechanical assembler. (R. at 346.)

Likewise, the ALJ did not adopt the restrictive findings noted in the FCE ordered by Dr. Winikur. In my opinion, the ALJ was justified in failing to incorporate the FCE findings into his residual functional capacity finding, as the evaluation was inconsistent with other evidence of record, particularly Dr. Winikur's own findings. The FCE findings showed that Underwood gave maximal, consistent effort throughout the evaluation and that the results were indicative of her performing to her true capabilities. (R. at 391.) Underwood was found to have an excellent ability in the following areas: active trunk hyperextension, right shoulder hyperextension, right shoulder internal rotation, bilateral active range of motion in the elbows, wrists, ankles and knees and right handgrip strength. (R. at 391.)

-50-

Underwood's ability was assessed as good in the following areas: active range of motion as to bilateral, lateral neck flexion, cervical hyperextension and forward cervical flexion, lateral trunk flexion to the right, right shoulder abduction, static push force, static pull force and right handed carry. (R. at 391.) Underwood's ability was found to be fair in bilateral hip abduction, bilateral hip and internal and external rotation, horizontal light and front carry, left handed carry, sitting and standing tolerance, walking ability, dynamic balance and right handed coordination. (R. at 392.)

The FCE also identified several significant deficits in Underwood's abilities. (R. at 392.) Underwood's ability was decreased as to active range of motion for bilateral cervical rotation, bilateral shoulder external rotation, bilateral hip abduction and hyperextension, floor to waist lift, dynamic pushing/pulling, left handgrip strength, stair negotiation and left hand coordination. (R. at 392.) It was determined that Underwood had a poor ability as to active trunk flexion, lateral trunk flexion to the left, bilateral shoulder flexion, left shoulder hyperextension, abduction and internal rotation, bilateral hip flexion with knees extended, waist to overhead lift, trunk flexion in sitting and standing, trunk rotation, kneeling, repetitive shallow squats and step ladder negotiation. (R. at 392.) Furthermore, the FCE concluded that Underwood was unable to perform elevated overhead work. (R. at 392.)

In comparison, Dr. Winikur completed three separate assessments of Underwood's condition. On December 5, 2005, Dr. Winikur completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 342-44.) Dr. Winikur found that Underwood could occasionally lift and/or carry items

-51-

weighing up to seven pounds and that she could frequently lift and/or carry items weighing up to three pounds. (R. at 342.) In addition, Dr. Winikur determined that Underwood could stand and/or walk for a total of six hours in a typical eight-hour workday and that she could stand and/or walk for one hour without interruption. (R. at 342.) He also found that she was able to sit for a total of two hours in a typical eight-hour workday and that she could sit for one half hour without interruption. (R. at 342.) Dr. Winikur reported that Underwood retained the ability to frequently climb, but that she could never stoop, kneel, crouch or crawl. (R. 343.) Furthermore, he noted that Underwood's ability to push and/or pull was affected by her impairments, but that her abilities to reach, handle, feel, see, hear and speak were found to be unaffected by her impairments. (R. at 343.) Dr. Winikur also found that Underwood's activities around heights, moving machinery, temperature extremes, humidity and vibration should be limited. (R. at 343.) No other environmental restrictions were noted. (R. at 343.) Dr. Winikur indicated that his findings were supported by clinical examination, as well as the FCE report. (R. at 342-43.)

Notably, Dr. Winikur's opinions changed between the first assessment and the July 7, 2007, assessments. (R. at 408-49.) Dr. Winikur found that Underwood was able to occasionally lift and/or carry items weighing up to 15 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 408.) He noted that these limitations were supported by medical findings relating to left shoulder, elbow and wrist pain/dysfunction. (R. at 408.) In addition, Dr. Winikur determined that Underwood could sit and stand/walk for a total of eight hours in a typical eight-hour workday, noting that she would only do so for two hours without interruption. (R. at 408.) He indicated that the medical findings as to Underwood's lumbar pain, leg

pain and sacroiliitis supported his assessment. (R. at 408.) Dr. Winikur found that Underwood could occasionally balance, but that she could never climb, stoop, kneel, crouch or crawl. (R. at 409.) While he noted no limitations as to Underwood's ability to feel, see, hear or speak, he found that Underwood was limited in her ability to reach, handle and push/pull. (R. at 409.) Lastly, Dr. Winikur noted environmental restrictions as to heights, moving machinery and temperature extremes. (R. at 409.)

Dr. Winikur also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on July 7, 2007. (R. at 410-11.) Dr. Winikur determined that Underwood had an unlimited/very good ability to follow work rules, a good ability to relate to co-workers and a fair ability to deal with the public, use judgment with the public, interact with supervisors and function independently. (R. at 410.) However, he determined that Underwood had a poor or no ability to deal with work stresses or maintain attention and concentration. (R. at 410.) Dr. Winikur found that Underwood had a good ability to understand, remember and carry out complex, detailed and simple job instructions. (R. at 411.) Lastly, Dr. Winikur found that Underwood had a good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 411.)

Thus, based upon a comparison of the limitations noted in the FCE and Dr. Wininkur's personal findings, as well as the record as a whole, it is completely understandable as to why the ALJ did not accord greater weight to the FCE findings. Accordingly, I am of the opinion that the ALJ was justified in according less weight to the FCE findings, as it was inconsistent with the remaining evidence of record.

-53-

Lastly, Underwood argues that the ALJ failed to pose a proper hypothetical question to the vocational expert. (Plaintiff's Brief at 18-20.) Underwood argues that the ALJ posed a question that was inconsistent with his own residual functional capacity determination. (Plaintiff's Brief at 19.) In particular, Underwood notes that the ALJ asked the vocational expert to consider a person who was limited as to pushing and/or pulling, when his residual functional capacity finding indicated that Underwood was unable to perform pushing and/or pulling. (Plaintiff's Brief at 19.)

Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) does the hypothetical adequately set forth the residual functional capacity as found by the ALJ. The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

In this case, the ALJ posed a series of hypothetical questions. First, the ALJ asked the vocational expert to consider a hypothetical individual of Underwood's age, education and work experience, who could occasionally lift items weighing up to 20 pounds, frequently lift items weighing up to 10 pounds and who could stand or walk for approximately six hours in a typical eight-hour workday. (R. at 433.) In addition

-54-

to those limitations, the ALJ asked the vocational expert to consider Underwood's mental impairments and other moderate limitations that restricted her to simple, non-stressful work. (R. at 433.) The vocational expert testified that such limitations would place Underwood in the light range of work, but noted that because bus driving qualifies as a semiskilled activity, the mental restriction of simple, non-stressful would not apply. (R. at 433.) The ALJ also asked the vocational expert to consider Exhibit 15F, which included a limitation as to pushing and/or pulling. The vocational expert opined that, based upon the limitations contained in Exhibit 15F, Underwood would be capable of performing sedentary work that allowed occasional standing. (R. at 436.) In addition, the ALJ posed a third hypothetical question asking the vocational expert to consider the limitations noted in Exhibit 24F, which was the FCE dated December 9, 2003, that included a restriction of no overhead reaching. (R. at 436-37.) The vocational expert indicated that such an individual would be able to perform a reduced number of sedentary occupations. (R. at 439.)

It is readily apparent from the three hypothetical questions posed that the ALJ failed to set forth a hypothetical that fully represented his residual functional capacity determination. Each of the hypothetical questions presented by the ALJ differed in some fashion from the ALJ's final residual functional capacity finding. Accordingly, because the hypothetical questions did not adequately set forth the residual functional capacity as found by the ALJ, the hypothesis failed to fit the facts and, thus, cannot be relied upon by the Commissioner. *See Swaim*, 599 F.2d at 1312.

*IV. Conclusion*

For the foregoing reasons, Underwood's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:     This 10th day of October 2008.


/s/ Glen M. Williams

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE